# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
November 19, 2013 Session

## STATE OF TENNESSEE v. MARQUIS DASHAWN HENDRICKS

**Appeal from the Criminal Court for Knox County**
**No. 96532   Jon Kerry Blackwood, Judge**

_____

**No. E2013-00346-CCA-R3-CD - Filed April 3, 2014**

_____

Appellant, Marquis Dashawn Hendricks, was indicted by the Knox County Grand Jury for first degree murder, attempted first degree murder, delivery of less than .5 grams of cocaine while employing a deadly weapon, possession of more than .5 grams of cocaine with intent to sell, and possession of more than one-half ounce but not more than ten pounds of marijuana with intent to sell.  After a jury trial, Appellant was convicted of first degree murder, attempted first degree murder, possession of cocaine with intent to deliver, possession of cocaine with intent to sell, and simple possession of marijuana.  Appellant received an effective sentence of life in prison for the convictions.  On appeal, Appellant challenges the sufficiency of the evidence, expert testimony about the trajectory of the bullet that was fired into the victim's vehicle, and the trial court's refusal to grant a mistrial on the basis of a *Brady v. Maryland*, 373 U.S. 83 (1963), violation.  After a review of the evidence and applicable authorities, we determine that the evidence was sufficient to support the conviction for first degree murder;  the trial court did not abuse its discretion in admitting expert testimony where the challenge to the testimony was related to the credibility of the expert's opinion; and the State did not commit a *Brady* violation so the trial court properly denied a mistrial.  Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court IS Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined and JAMES CURWOOD WITT. JR. J., dissenting.

Mike Whalen, Knoxville, Tennessee, for the Appellant, Marquis Dashawn Hendricks.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall Nichols, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

The facts giving rise to Appellant's indictment and ultimate convictions arose from events that took place in Knoxville between November 12 and 13, 2012.

Nathaniel Bolding and Keith Hammock, brothers-in-law, lived in Lake City at the time of the incidents. Mr. Bolding, his wife, and two children shared a home in Lake City with his mother-in-law, Mr. Hammock, and Mr. Hammock's daughter. Mr. Hammock and Mr. Bolding were also good friends with a penchant for partying, drinking, and drug use. Mr. Bolding first established a relationship with Appellant when he lived at the Lonsdale housing project in Knoxville before moving to Lake City. In order to purchase crack cocaine from Appellant, Mr. Bolding renewed his relationship with Appellant several weeks prior to the incidents that took place in November of 2012.

At some point between the evening of November 12 and the morning of November 13, 2012, Mr. Hammock and Mr. Bolding went from Lake City to Knoxville several times to purchase drugs from Appellant. During one of the transactions, both Mr. Hammock and Mr. Bolding were shot as they were driving away from the purchase place. Mr. Hammock died as a result of his wounds. Mr. Bolding was shot in the right arm.

As a result of a police investigation, Appellant was indicted by the Knox County Grand Jury in February of 2013 for first degree murder, attempted first degree murder, delivery of less than .5 grams of cocaine while employing a deadly weapon, possession of more than .5 grams of cocaine with intent to sell, and possession of more than one-half ounce but not more than ten pounds of marijuana with intent to sell. The case proceeded to trial.

At trial, Nathaniel Bolding testified. At the time of trial, he was twenty-nine years old and lived and worked at a rehabilitation center in Jacksonville, Florida. Mr. Bolding recalled his relationship with his deceased brother-in-law, Mr. Hammock. He explained that the two men were good friends but that they were not good influences on each other because they partied, drank, and used drugs together.

About two weeks prior to Mr. Hammock's death, Mr. Bolding took Mr. Hammock to Appellant's apartment to buy crack cocaine.

Mr. Bolding recalled that the day prior to Mr. Hammock's death, Mr. Hammock traded Appellant a television worth $2,000 for $100 worth of crack cocaine. According to Mr. Bolding, Appellant only gave them fifty dollars worth of crack cocaine. Mr. Bolding and Mr. Hammock smoked the crack cocaine.

On the day of Mr. Hammock's death, Mr. Hammock pawned a pressure washer for cash. The men bought a bottle of tequila with the money. Subsequently, the men went to Appellant's apartment where Mr. Hammock gave Appellant $100 so that he could get his television back from Appellant. Appellant informed Mr. Hammock that the television was at Chris Page's house. When Mr. Bolding and Mr. Hammock went to Mr. Page's house, they did not find the television.

At some point that same day, Mr. Hammock and Mr. Bolding bought $80 of crack cocaine from Appellant. The men returned to Lake City where they sat around a fire and smoked crack cocaine and marijuana. The marijuana was purchased from Chris Page earlier that same day. The men eventually ran out of crack cocaine so they decided to drive to Knoxville to purchase more crack cocaine. Mr. Hammock called Appellant. The men went back to Knoxville around 10:30 p.m. They bought another $80 worth of crack cocaine and smoked it on the way back to Lake City.

Desperate for more drugs, the men decided to return to Knoxville once more to purchase crack cocaine from Appellant. According to Mr. Bolding, the men had approximately thirty dollars between the two of them. They arrived on Texas Avenue at around 1:30 a.m. Appellant sold them more crack cocaine. The men returned to Lake City where they smoked the crack cocaine and drank the rest of the tequila. While they were drinking and using drugs, Mr. Hammock became agitated as he thought about the television that he lost to Appellant. The more upset Mr. Hammock became, the more he wanted to return to Knoxville.

At some point during the night or early morning, Mr. Bolding stated that the two men left Lake City again to go to the methodone clinic in Knoxville. When they left town, Mr. Bolding drove the car because Mr. Hammock was too intoxicated to drive. The men decided that they would purchase more crack cocaine from Appellant and if Appellant did not return the television to Mr. Hammock they would drive off without paying for the drugs.

As the men approached Appellant's apartment in their car, Appellant came out to meet the car. Appellant leaned over and handed the drugs to Mr. Hammock, in the passenger seat. When Mr. Hammock asked Appellant for his television, Appellant told him that he did not have the television. Mr. Hammock instructed Mr. Bolding to drive away. As they drove

away, Appellant said, "don't do it bitch" before pulling a pistol from his waistband and firing it at the car.

According to Mr. Bolding, the car had traveled about ten to fifteen feet when he heard three shots. Mr. Hammock immediately slumped over in the seat and knocked the car into neutral. Mr. Bolding tried to put the car into drive when he realized that he had been shot in the right arm. He had to use his left arm to shift the car into drive. Mr. Bolding tried to drive the car to the interstate to get Mr. Hammock to the hospital. As he approached Merchants Road, Mr. Bolding got dizzy and pulled off the road. At this point, Mr. Hammock was unresponsive. Mr. Bolding left the car, ran to a gas station, and had someone call 911.

Mr. Hammock was deceased by the time officers arrived on the scene. He suffered two wounds to the face that were not fatal and a gunshot wound to his back that hit a rib, entered his lung, and then hit the superior vena cava and aorta. Mr. Hammock died approximately one minute after being shot.

Officer Brian Moran responded to the scene at I-75 and Merchant's Road. Mr. Bolding identified Appellant from a lineup. Appellant was taken into custody. When questioned, Appellant denied knowing anything about a television and denied being responsible for the shooting but admitted selling cocaine. Appellant claimed that he was at a club called "Malibu" before going to his mother's house to sleep.

Officer Moran recalled that initially, Mr. Bolding stated that he got money rather than crack cocaine in exchange for the television and became upset when Appellant tried to sell them more crack cocaine when they came back to Knoxville to pay off the loan. Mr. Bolding's testimony at trial was that they were just trying to retrieve the television. Further, Bolding initially claimed that they came to Knoxville that night four times to buy crack cocaine but did not inform officers of their plan to rob Appellant.

The State attempted to introduce at trial the testimony of Sergeant Brian Dalton, the lead of the forensic unit of the Knoxville Police Department. Counsel for Appellant objected to Sergeant Dalton's testimony about shooting reconstruction because he did not examine the car until one week prior to the trial, nearly one year after the incident. The trial court held a jury-out hearing to hear the proposed testimony and determined that the objection was related to the weight of the expert's opinion rather than the admissibility of the evidence. The trial court overruled the objection.

Sergeant Dalton was certified by the trial court as an expert in shooting incident reconstruction. In preparation for reconstructing the incident, Sergeant Dalton reviewed

photographs of the car taken on the night of the incident and the day after the incident by Tiffany Hamlin, a forensic evidence technician for the Knoxville Police Department. The photographs helped Sergeant Dalton to see any changes in the car in the year between the incident and his own observations.

Sergeant Dalton identified two defects in the right rear passenger door glass and one defect in the door itself. He explained that impacts that penetrate glass show a coning effect, meaning that as a bullet or projectile hits the glass, it starts to push material out in front of it, causing a wider opening on the exit side than on the entrance side. There were two defects in the passenger seat near the right-hand side of the headrest as well as an entrance and exit defect on the portion of the car that separated the passenger front door from the passenger rear door where the seatbelt attached to the car. There was also a defect in the back window, but because the window was completely out of the car, Sergeant Dalton was unable to determine whether it was an entrance or exit defect.[1]

Upon further observation, Sergeant Dalton was able to determine the approximate flight path of the three primary defects by using "flight path rod[s]" or short sections of steel rods that connect each defect and allow a person to get the "best estimate" of the original angle of the path of the bullet. Sergeant Dalton found four penetrating gunshots to the car including two different bullets that terminated their flight paths in the passenger seat. One bullet terminated at the bottom of the seat and the other traveled through the back of the seat to where the passenger would have been sitting. Of the four flight paths, Sergeant Dalton opined that three of the shots came from outside the car at a downward angle. He was unable to determine if the fourth shot, traveling through the back window, was fired from inside or outside the car.

Appellant testified at trial. He claimed that he met Mr. Bolding during the summer of 2010 and met Mr. Hammock about three months prior to the shooting. Appellant admitted that he sold crack to both men but denied giving drugs to either man without payment.

Appellant claimed that Mr. Bolding tried to sell him a .25 caliber pistol on the same day that Mr. Hammock brought the television. Appellant denied all involvement in the television deal, claiming that his cousin Chris Page was the one who brokered that deal.

On the day prior to the shooting, Appellant claimed that Mr. Hammock came by his apartment by himself asking for $100 worth of crack cocaine. Mr. Hammock came back later in the afternoon with Mr. Bolding. The men met in the parking lot where Appellant sold

_____

[1] The back window had either been taken out or had fallen out by the time of Sergeant Dalton's observations. It was in the back seat of the car.

them $60 worth of crack cocaine. Mr. Hammock and Mr. Bolding called back a few hours later looking for $120 worth of crack cocaine. When they made the exchange, Appellant only received $80. Mr. Hammock and Mr. Bolding tried to convince Appellant to "front" the drugs, and they would bring him the money later. Appellant refused, and took back some of the crack cocaine. About thirty minutes later, Mr. Hammock and Mr. Bolding called again, this time wanting forty dollars worth of crack cocaine. The men came by with forty dollars, and Appellant sold them crack cocaine.

Around 2:00 a.m., the men called Appellant again, this time looking for $150 in crack cocaine. Appellant was at a club across town; Mr. Bolding assured Appellant that he had the money. Appellant was asked to meet the men on Texas Avenue. They normally met in a parking lot behind Appellant's aunt's apartment. For the first time that day, Mr. Bolding was driving the car. Mr. Bolding explained that Mr. Hammock was too drunk to drive. Mr. Hammock tried to talk Appellant into giving them extra crack cocaine. Appellant told them he was already giving them a good deal and leaned into the car to show Mr. Bolding how much crack cocaine he was offering to the men. At that point, Appellant claimed that Mr. Hammock stuck something in his chest. He could not tell if it was a gun but thought it might be because Mr. Bolding offered to sell him a gun at some earlier time. Mr. Hammock told Appellant to give him everything. Appellant told Mr. Hammock that everything he had was on the console of the car. As Mr. Hammock turned to look on the console, Appellant reached for his own gun and fired as he backed away from the car. Appellant stated that he tripped over the curb as the car backed away.

When the car stopped, Appellant fired again, striking the back window. Appellant testified that he was afraid Mr. Bolding and Mr. Hammock had stopped the car to shoot him. Appellant admitted that he fired multiple shots into the car as it was driving away. Appellant could not tell if he had hit anyone in the car but did not intend to kill anyone that night. He fired at Mr. Hammock intending to shoot him because he was afraid he was about to be shot.

Sometime later, Appellant learned that he hit someone with a bullet. Appellant admitted that he lied to police about where he was on the night of the shooting, about having a gun, and about his phone number. Appellant also admitted that he used a false name and address in order to purchase his telephone and that he got rid of the murder weapon by giving it to a friend named "Joe."

At the conclusion of the proof, the jury found Appellant guilty of first degree murder, attempted first degree murder, delivery of more than .5 grams of cocaine, possession of more than .5 grams of cocaine with intent to sell, and simple possession of marijuana. Appellant received an effective sentence of life in incarceration. Appellant appeals, arguing that the evidence was insufficient to support a conviction for first degree murder or attempted first

degree murder; that the trial court erred in admitting expert testimony; and that the trial court erred in failing to grant a mistrial.

*Analysis*

*Expert Witness Testimony*

On appeal, Appellant complains that the trial court erred in allowing the expert testimony of Sergeant Dalton. Specifically, Appellant challenges testimony regarding the trajectory of the bullets because Sergeant Dalton did not perform tests on the car until the week prior to trial. The State insists that the trial court did not abuse its discretion and that Sergeant Dalton was qualified as an expert to testify about the bullet trajectory.

At the outset, we note that Appellant does not challenge whether the trial court properly certified Sergeant Dalton as an expert in shooting incident reconstruction. At trial, Sergeant Dalton testified to his qualifications and expertise and was properly certified as an expert under Rule 702 of the Tennessee Rules of Evidence, which governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702.

Rule 703 of the Tennessee Rule of Evidence provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Determinations regarding the admissibility of expert testimony are left to the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). On appeal, our standard of review is whether the trial court abused its discretion by allowing the expert testimony. Before reversing the trial court's determination, we must determine that the

record shows that the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999); *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

Rule 703 of the Tennessee Rules of Evidence contemplates three possible sources from which an expert may base his/her opinion: (1) information actually perceived by the expert; (2) information made known to the expert by others; and (3) information reasonably relied upon by experts in the particular field. *See* Tenn. R. Evid. 703; *see also* Neil P. Cohen, et. al., *Tennessee Law of Evidence* §§ 7.03(3), 7.03(4), 7.03(5) (5th ed. 2005). In other words, Rule 703 contemplates that inherently reliable information is admissible to show the basis for an expert's opinion, even if the information would otherwise constitute inadmissible hearsay. *See* Tenn. R. Evid. 703. It is not uncommon for an expert witness's opinion to be based on facts or data that are not admissible into evidence but are reliable. *See* Neil P. Cohen et al., *Tennessee Law of Evidence* § 7.03(4).

As we stated above, there is no dispute that Sergeant Dalton was properly qualified as an expert in shooting incident reconstruction. His testimony was based upon his personal observations during his examination of the car and his specialized education, training, and experience. Appellant challenged the admissibility of the testimony at trial not on the basis of his qualifications but on the basis that it had been too long between the incident and Sergeant Dalton's observations for the opinion to be accurate. Appellant objected to the testimony at trial, and the trial court held a jury-out hearing.

At the hearing, the trial court listened to the proposed testimony as well as Sergeant Dalton's qualifications and determined that the concerns expressed by counsel for Appellant about the testimony went to "the weight of [Sergeant Dalton's] opinion rather than its admissibility." As a result, the trial court overruled the objection to the testimony and allowed Sergeant Dalton to testify as to his opinion on the trajectory of the bullets fired into or out of the car at the incident. Based on Tennessee Rule of Evidence 703, we determine that the trial court properly certified Sergeant Dalton as an expert and admitted his testimony on shooting incident reconstruction. Additionally, we determine the trial court properly allowed admission of Sergeant Dalton's opinion of how the incident took place based on his own personal observations from viewing the car a year after the incident as well as photographs taken during the police investigation in close proximity to the incident. The expert witness testified about the condition of the rear window and car as a whole a year after the incident and he determined that it was unclear if the hole in the back window of the car was an entrance or exit defect. This lapse of time did not make the testimony irrelevant but rather went to the weight and credibility of the expert's testimony and was a factor for the jury to consider. Accordingly, we hold the trial court did not abuse its discretion in admitting

the expert witness's testimony regarding the trajectory of the bullets fired at the incident. Appellant is not entitled to relief as to this issue.

*Alleged Brady Violation and Mistrial*

Next, Appellant complains that the trial court should have granted a mistrial due to the State's alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Appellant argues that the State knew prior to trial that Mr. Bolding lied when he denied that he came to Knoxville to rob Appellant and changed his story prior to trial regarding the source of the money used by Mr. Hammock to purchase crack cocaine. The State disagrees, arguing that they were under no duty to disclose the statements because they were not exculpatory in nature and they were neither favorable nor material to Appellant's case.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In order to establish a due process violation under *Brady*, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
> 2. The State must have suppressed the information;
> 3. The information must have been favorable to the accused; and
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). *Brady* does not require the prosecution "to disclose information that the accused already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. *Edgin*, 902 S.W.2d at 389.

This Court has stated that in order to establish a *Brady* violation, the information need not be admissible, only favorable to the defendant. *See State v. Spurlock*, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Johnson v. State*, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting *Commonwealth v. Ellison*, 379 N.E.2d

560, 571 (Mass. 1978)). This Court will deem evidence material if a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed. *See United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 682 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

We have reviewed the evidence in question. Appellant seems to argue that the statements of Mr. Bolding are exculpatory and material because they go to the credibility of Mr. Bolding and prove that the shooting was not premeditated. While the statements and possibly the pawn slips are favorable to the defense because they call into question the credibility of a witness, we determine that the information was not exculpatory. Further, the State did not withhold the information. As stated by counsel at trial, the testimony elicited from Mr. Bolding at trial was the same as the testimony he gave at the preliminary hearing but different from his original statements to police. The main distinction is that, at trial, Mr. Bolding actually stated that he and Mr. Hammock planned to "rob" Appellant. Additionally, the source of the funds used to purchase the drugs is neither favorable nor material to Appellant's defense. The jury learned of the discrepancies in Mr. Bolding's claims through cross-examination. There is no reasonable probability that the outcome of the trial would have been different had this evidence been disclosed prior to trial. In other words, no rational jury would have found that evidence of a planned robbery or evidence that a pressure washer was pawned by Mr. Hammock would establish adequate provocation for Appellant to shoot and kill Mr. Hammock or shoot and injure Mr. Bolding. Thus, Appellant has failed to show prejudice. Because we determine that there was no *Brady* violation, we further determine that the trial court did not err in failing to grant a mistrial. Appellant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Lastly, Appellant challenges the sufficiency of the evidence. Appellant cites *State v. Brandon Compton*, No. E2005-011419-CCA-R3-CD, 2006 WL 2924992 (Tenn. Crim. App., at Knoxville, Oct. 13, 2006), *perm. app. denied* (Tenn. Feb. 26, 2007), to support his argument. He insists that the State failed to prove premeditation. The State disagrees, arguing that there was sufficient evidence of premeditation

To begin our analysis, we note that when a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S .W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally deemed with a presumption

of innocence, the verdict of guilty removes this presumption and replaces it with one of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.*

The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence. *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 599, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). As such, all reasonable inferences from evidence are to be drawn in favor of the State. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *see Tuggle*, 639 S.W.2d at 914.

Appellant raises this issue in regard to his convictions for both first degree murder and attempted first degree murder. He complains that there is a "complete absence of the circumstances from which premeditation can be presumed and there is no indication that Appellant was free from the upset caused by the robbery perpetrated against him at the time the shots were fired."

When a defendant is charged with the attempted commission of a crime, there must be evidence that the defendant "[has acted] with the kind of culpability otherwise required for the offense" or "[has acted] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; . . . ." T.C.A. § 39-12-101(a)(1), (2). Criminal attempt also occurs when the defendant

"[a]cts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3).

> First degree murder is defined as:
>
> (1) A premeditated and intentional killing of another;
>
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy; or. . . .

T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. *Id.* § 39-11-106(a)(18). Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

Premeditation may be proved by circumstantial evidence. *See, e .g., State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Our high court has identified a number of circumstances from which the jury may infer premeditation: (1) "the use of a deadly weapon upon an unarmed victim;" (2) "the particular cruelty of the killing;" (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the

killing. *Bland*, 958 S.W.2d at 660; *see also Pike*, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660.

One learned treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2003).

The evidence introduced at trial, in the light most favorable to the State, established that Appellant and the victims had partnered in several drug transactions throughout the day leading up to the shooting. Mr. Bolding and Mr. Hammock were so desperate for drugs that they exchanged a $2,000 television for $100 worth of crack cocaine cocaine. When the men attempted to repay the $100 to get the television, Appellant refused to return the television. Mr. Bolding and Mr. Hammock were irritated that Appellant would not return the television but continued to purchase drugs from Appellant. On their last trip to Knoxville, they decided to take the drugs from Appellant if he continued to refuse to return the television. During the last transaction, Appellant gave the drugs to the men while they were sitting in the car on Texas Avenue. Mr. Hammock again asked Appellant to return the television. Appellant claimed that he did not have the television. At that point, Mr. Hammock instructed Mr. Bolding to drive off, taking the drugs without paying for them. At that point, Appellant immediately pulled out a gun and began shooting, killing Mr. Hammock and injuring Mr. Bolding.

From this evidence, a rational jury could conclude that Appellant intentionally killed Mr. Hammock and that the killing was premeditated. There is no dispute that there was an established business relationship between the men and that Mr. Hammock and Mr. Bolding tried to drive off from the transaction without paying for the crack cocaine. The evidence at trial indicated that there was no weapon found in the victims' car; the jury was free to

conclude they were unarmed when Appellant shot them. After the shooting, Appellant disposed of the gun. Moreover, on at least several separate occasions, Appellant denied knowing anything about a television. He also denied being responsible for the shooting.

Further, we find this case distinguishable from *Brandon Compton*, the case cited by Appellant in support of his argument that there was no premeditation. In *Brandon Compton*, the defendant came to a residence to sell marijuana. He was armed. 2006 WL 2924992, at *1. The victims did not know the defendant prior to showing up at the residence to buy marijuana. When money exchanged hands, the defendant suspected that the money was counterfeit. The defendant dipped the money in a bowl of water to see if it was counterfeit. *Id.* The defendant informed the men that the money was counterfeit. He asked for the return of the drugs. The men refused and walked toward the door. The defendant followed the victims down a hallway, then shot both of them twice in the back, saying, "That's what you get for stealing my weed." The defendant left the residence and disposed of the gun. *Id.* at *5. The jury found premeditation, but this Court overturned the finding of premeditation because the defendant was not "free from excitement and passion" after his property was stolen. *Id.* The Court recognized that "[t]he shooting proceeded to a conclusion without any intervening or dispassionate reflection." In this case, there were two versions of the incident. Appellant insisted he shot in self-defense, not that he shot because the men stole his drugs. The State argued that the shooting was a premeditated act, occurring after the men tried to steal the drugs. Additionally, Appellant would be able to keep the $2,000 television if the men were dead. The weight and value of the evidence is a matter entrusted to the jury. *State v. Pruett*, 788 S.W.2d 599, 561 (Tenn. 1990). The jury reviewed the evidence and determined that it supported premeditation. Appellant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JERRY L. SMITH, JUDGE

-14-